# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| **OMAYRA MARTINEZ,** ) | |
| 4902 Gully Court ) | |
| Oxon Hill, MD 20745 ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| **vs.** ) | **Case No:19-1490** |
| ) | |
| **ENTERCOM COMMUNICATIONS** ) | **Civil Complaint for Violations of** |
| **CORP, AKA ENTERCOM** ) | (i)  DC Code § 32-1302 - Wage |
| ) | Payment Collection Act |
| *Defendant*. ) | (ii)  DC Code §2-1402.11 - DC |
| ) | Human Rights Act |
| ) | (iii)  42 USC §1981 |
| | (iv)  Misappropriation of Likeness |
| | (common law claim) |

_____     **Jury Demand**

## COMPLAINT

**COMES NOW** the Plaintiff, Omayra Martinez ("Martinez"), by and through undersigned counsel, and for her Complaint states as follows:

## PART I. PARTIES

1.  Martinez is from Puerto Rico. Martinez was employed by the Defendant in its DC office from February 2016 until the day of her termination on August 11, 2017. Martinez was an employee of Defendant per D.C. Code § 32-1301(2).

2.  The Defendant Entercom Virginia, LLC ("Entercom") is one of the country's two largest radio broadcasters. Entercom was formerly the licensor (licensing to CBS Radio) of the radio station for which Plaintiff worked, and is now the owner of the commercial FM radio station, 107.9 FM, "El Zol 107.9 FM." Entercom was Plaintiff's / successor in interest to Plaintiff's employer per D.C. Code §32-1301(1B).

## PART II. JURISDICTION AND VENUE

3.   This Court has jurisdiction over this action Under U.S.C § 1331. The action under Section 1981 is bring brought under 42 U.S.C § 1981.

4.   Venue is proper in the Court because both the Plaintiff and the Defendants are within this Court's jurisdiction; the Plaintiff was also employed and terminated by Defendant while working at its office in Washington, D.C.

## STATEMENT OF FACTS

5.   Martinez (female) is a United States citizen. Martinez was born and raised in Puerto Rico and identifies as Puerto Rican, and exhibits the ethnic characteristics associated therewith.

6.   Martinez attended college at the University of Puerto Rico where she received a B.A. in Science of Communications.

7.   While in college Martinez was working in the entertainment industry:

   a.   She started at Shownet, a production and event company, where she handled sales and corporate sponsorships (Coca-Cola, McDonald's, etc.) for 5,000+ attendance events for both local and national artists (eg. Cultura Profetica, La Secta, Los Rabanes, Tego Calderon, Hector "El Father" & Tito "El Bambino", Daddy Yankee, among others).

   b.   During her senior year she began working for Kroma Advertising & Public Relations, an advertising agency with operations in Puerto Rico, Washington D.C., New York, Miami and Cuba.

8.   After graduation, Martinez worked her way up at Kroma to senior account manager where she was responsible for the public relations department managing ten (10) employees and serving top tier clients in the Puerto Rican market – eg. R.J. Reynolds, Bacardi, Rums of Puerto

Rico, Puerto Rican Tourism Company, Puerto Rico Department of Treasury, Department of Justice of Puerto Rico, Puerto Rico Trade and Export Company, The Ferre Family (own the majority of the newspapers in the US territory), The Fonalledas family (owners of Plaza Las Americas, Plaza Del Caribe, and own the majority of the milk industry on the Island).

9.      During 2009, Martinez's boss at Kroma, recommended she move to the U.S. and explore and maximize her potential, learn about the U.S. Hispanic markets, and expand her experience in the corporate and entertainment fields.  Martinez took that advise and moved to the Washington D.C. area.

10.     After moving, Martinez's first job in media was a sales position for "The Merchandiser," a weekly newspaper focusing on home improvement.

11.     She also began to volunteer with the Mid-Atlantic Hispanic Chamber of Commerce, where the head of the organization, Mr. Rivas, took note of her potential, and introduced her to the general sales manager for El Zol 107.9 at CBS Radio.

12.     Martinez was offered a job as a media sales account executive by El Zol 107.9.

13.     While at El Zol 107.9 she built excellent relationships with management and the on-air talent, including but not limited to Pedro Biaggi (male, Puerto Rican) who was host of the morning radio show.

14.     She remained at El Zol 107.9 just over a year; after a short stint at 87.7 FM, she began working as a senior account representative at Univision, one of the top Hispanic television networks in the U.S

15.     Martinez remained with Univision until April 2015, when she resigned to open her own advertising agency.

16.     In August of 2015, things were going well and Martinez was enjoying her work, when she received a call from Pedro Biaggi, the morning radio host for El Zol 107.9.  Biaggi advised that he was looking for a new co-host, and he let Martinez know he wanted her to take on that role and advised the salary for the position was $50,000.00.  She said she would think about it.

17.     Biaggi continued to contact Martinez for the following two weeks, until she agreed, and was advised she would go through an audition process.

18.     In September 15, 2015, Martinez began the two-week audition process to be the morning co-host with Biaggi at CBS Radio's "El Zol 107.9." This audition process took place in their DC office / studio.

19.      The audition process went well and Biaggi was very excited as their chemistry on air was excellent and, to her surprise, Martinez was enjoying being "on the spot" (as opposed to behind the scenes as she had been in the past).

20.     On or about September 23, 2015, Martinez received an email from the programming director, Robert Sanchez (male, Cuban), asking her to formally interview for the morning co-host position on September 28, 2015.

21.     Sanchez, along with his assistant Candida "Candy" Cintron (female, Venezuelan background, born in New York), interviewed Martinez on 9/28/2015 and advised Martinez that her annual salary would be $50,000, plus benefits, and additional pay for endorsements, and appearances.

22.     Martinez accepted the position and asked about the next steps.  She was advised they would begin processing the paperwork.  There was no mention of going online to submit an application.

23.     Martinez continued working in the capacity she had been during the two-week audition process, as co-host on the show.

24.     Martinez was excited about her new position and opportunity, and arrived to work at 4:30 am rather than the required 5 am, as she wanted to learn about the production side of the business.

25.     The morning show was live from 6-10 am, and Martinez and Biaggi turned out to be a great team with excellent chemistry on air.

26.     Two weeks after starting the job (after the audition process), Martinez had not yet had her paperwork processed. She inquired and was told it will be done soon.

27.     A month after starting, she inquired again, as she was receiving no pay or benefits to date and was again told it will be done soon.

28.     During this time, Martinez was advised that a third individual – Ray Parker (who is male / Panamanian) - would be joining the morning show and *replacing* Martinez as the "co-host" (who was male and *not* Puerto Rican) and she was told her role was now "on-air talent."

29.     Despite the alleged change in her role, Biaggi was treating Martinez as the co-host during the on-air radio show.

30.     There was no mention of any change in her agreed upon annual salary of $50,000.00 plus benefits (none of which had been received to date).

31.     Ray Parker was the music director of the station, and when he was given the co-host job he was provided additional salary to reflect his additional duties.

32.     Martinez also learned from Biaggi, who was very happy with the way things were going with Martinez as the co-host, that he was being pressured by CBS Radio executives (Cintron

and Sanchez) to remove Martinez as his co-host, as – per Cintron and Sanchez - she "sounded too Puerto Rican."

33.     In early November 2015, Martinez, who had still not been paid nor received any benefits, sent an email to Sanchez asking about her paperwork for her contract, salary and benefits.

34.     Sanchez via email on 11.10.15 informed Martinez that she (Martinez) was doing a "great job" but he was not sure if there was a full-time position available for her, but he was checking with corporate and said the full-time position would not be much more than $40,000/year.  He also said he was surprised that she continued to come "on her own" for the two months since her audition period ended and she did not have to continue to come to be a candidate for the position.

35.     This was very confusing to Martinez, as she was previously offered a full time position with benefits and a base salary of $50,000 per year plus endorsements and appearances, and began work immediately after her two week audition period.

36.     Via email on 11.12.15, Sanchez detailed the steps necessary for bringing new employees on board.  Martinez was confused as to why this was never brought to her attention before.

37.     Mid-November, "Jane" from HR contacted Martinez about a dispute between Sanchez and Biaggi.  After answering questions, Martinez inquired about her "paperwork."  Jane was visibly confused, had no idea what Martinez was talking about and referred her to Sanchez.

38.     Soon thereafter, just before Thanksgiving, there was a meeting with Biaggi (Puerto Rican), Parker (Panamanian), Cintron (half Venezuelan, born and raised in New Jersey / New York) and Martinez (Puerto Rican), where Cintron advised that Parker was now the co-host, and

she asked Martinez to stay home while they processed her paperwork and advised it may 1-2 weeks.

39.     Martinez did as instructed, but never heard from Sanchez or Cintron.

40.     She did hear from Biaggi a week or so later, and he asked where has she been and why has she not returned. She let him know that she had not heard from Sanchez or Cintron.

41.     Biaggi said not to let them treat her like this as they cannot go back on their word(s) about the $50,000/year full time position offered during the initial job interview.

42.     In December Martinez began following up with Sanchez and Cintron, who now were telling her she would have to go through the website and formally apply for the *part-time* on-air talent position posted on the website.

43.     Martinez was, of course, confused, as she auditioned for and was offered a full-time position; further no one ever mentioned going through the CBS website as a first step for the paperwork process.  The emotional distress to which she was being subjected began to feel less negligent and more intentional.

44.     Martinez began to suspect that her employment as Biaggi's co-host had been sabotaged from day one (Cintron and Sanchez failing to let her know to apply via the website or the steps to becoming an employee from the beginning).  Yet, she complied and applied through the website.

45.     After submitting the application, Sanchez and Cintron contacted her in early December for a second interview.  This, of course, confused Martinez as well given she was offered and accepted the position at 50k/year two months prior.

46.     On December 7, 2015, during the second interview, Sanchez and Cintron stated the position was part-time with no benefits and that the salary was tentatively $30k/year.

47.     This offended Martinez, who responded that she would have to take a couple of days and think about whether she was interested anymore given how she was being treated and the lack of transparency during the hiring process.

48.     In early January 2016, while considering whether to take this new alternate part time job with no benefits and tentative salary, Martinez submitted several proposals that would allow her to supplement her income.  The proposals involved creative ways that Martinez could bring the $30,000.00 salary up to $50,000.00 (using inventory – airtime – to acquire product / service endorsements, etc.).  They were all rejected.

49.     In mid-January 2016, Sanchez sent an email stating he did not have a 2016 budget approved yet, so could not confirm the offer for the part-time position. Yet, it seemed unlikely that there were no budget as other employees had signed their 2016 contracts for full-time positions with full benefits, suggesting Sanchez was not being truthful with Martinez.

50.     A third interview was set up for February 4, 2016, and this time Sanchez confirmed the salary was $30,000, but pending approval from upper management.

51.     In mid-February 2016, Martinez was advised the position was approved, salary would be $30,000 and no benefits, but she was told she would make $50,000 thanks to endorsements and appearances.

52.     Having worked for months at this point with no pay, Martinez was in dire need of income, so she "re"-accepted the position under duress, this time for a part time position paying $30,000.00 and no benefits, with the understanding she could supplement her income with endorsements (on-air product ad mentions) and appearances (on-site for businesses, events, etc) – with one caveat: no night club appearances during weekdays as her hours for the morning show

were early and she did not want to be up until 3 am; and, as she was aware none of the morning

show co-hosts were required to do so during the weekdays.

53.      Sanchez and Cintron agreed, confirming those opportunities (club appearances)

could be offered to other on-air talent.

54.      Martinez showed up for work on February 22, 2016, and had still *not been paid the

$25,000 she was owed for the almost six months on the job*.

55.      With her first paycheck processed in February 2016, Martinez received $2,000 "for

the audition period" per Sanchez – after five months (which would be $25k for half a year under

the promised salary) this was a drastic difference from the salary she was promised.

56.      Upon her return, while she was told she was not the co-host, Biaggi continuing to

treat her like the co-host during the morning shows.

57.      Further, as the only female Puerto-Rican on air talent she was being paid much less

than all other on air talent, who held full time positions, received benefits, and worked fewer hours.

58.      During the show, often Cintron would come on-air and criticize / demean

Martinez's accent, her choice of words or otherwise offend her, and this was done LIVE and ON

AIR.

59.      It was highly unusual and demeaning for a producer to get on-air to criticize the on-

air talent.

60.      Off-air Cintron would often state "the show sounds too Puerto Rican" and on and

off air she would say to Martinez "you talk to fast … you are using very Puerto Rican words" and

mocking how Puerto Ricans pronounce "L" and "R" in – per her – the wrong way.

61.      Biaggi, on the other hand, was telling Martinez she was doing great, continue to be

herself, and don't let the negative comments stress her out.

62.     Also at this time Martinez was being pushed to do club appearances on Thursdays, which would require her to be out until 2:30-3 am – something she specifically said she did not want to do. This extended her workday from 9-10 hours to 14-15 hours a day.

63.     Martinez complained about being pushed to do the evening appearances, pointing out that morning talent are not asked to do evening appearances during weekdays for obvious reasons (very early hours).

64.     Generally, when a host of a show (there were four shows: morning, mid-day, afternoon, evening) is out, the co-host would act as the host and run the show.

65.     However, with El Zol 107.9 morning show, if Biaggi was not available, Parker (formal co-host) nor Martinez ("on air talent") were allowed to act as the host – Cintron would show up early during those days and act as producer, host and board operator.

66.     In July 2016, Sanchez had the first *ever* meeting with the early show talent (since October 2015; APDs – assistant program directors - normally met with on air talent monthly, and PDs – program directors - once per quarter at least).

67.     At this first ever meeting Sanchez stated that ratings for the morning show were dropping, and he was pointing the finger at Martinez as possibly the reason for the drop.  Martinez was offended, as Sanchez clearly did not see Cintron's behavior on air as a problem that would turn off listeners, or even the fact that Martinez was *not the host or the co-host* of the show, yet he was trying to place the blame on her.

68.     In December 2016, Biaggi had a meeting with upper management regarding his 2017 contract to discover he will not be renewed (after 11 years with the Station) based on the disagreements between Sanchez and Biaggi over the past year – Sanchez's criticism of the Puerto Rican accents on air and express desire for "male" on air talent.

69.     At that time, Martinez was wondering about her future with the Station.  She was aware of the disagreements between Sanchez and Biaggi, and she had a Puerto-Rican accent (and in fact had already been replaced as the official "co-host" by Parker).

70.     Sanchez and Cintron's plans were to move Martinez into the PM drive and evening shift starting 2017.

71.     Martinez was not given the option to stay in the morning show -which was her preference.

72.     Mid December 2016, Sanchez asked Martinez to apply for the full time "on-air talent" position through the website; and also advised her the training for the position, which included training as a board operator, would begin during the Holidays, and asked if she would be available.

73.     Martinez canceled her leave, which had been requested and approved, based on Sanchez's statements that the training would involve Martinez merely presenting music (talking during the intro of a song before the singing starts), and she would be allowed to pre-record ahead of time.

74.     Martinez agreed to apply, cancel her vacation days and do the training to learn about the Radio Board and Vox-Pro (the device used for pre-recording and editing a radio show).

75.     Martinez arrived on the first day of training, and it turns out Cintron is present. Martinez was told it would just be the Radio Board trainer and Martinez, with Cintron showing up now and then for support.

76.     Cintron had decided that morning that the show would go through a history of the entire year from the perspective of the entertainment world, which required a significant amount of content, and editing of that content, for the show.

77.     Normally, that work would have all been pre-produced, i.e. done the day before, which would allow the on air talent to use the Pro-Vox device on the day of the show.

78.     As the content was not pre-produced, that work occupied the Vox-Pro device, Martinez was unable to use the device herself, which meant she would be live on air and not just presenting music, but discussing a plethora of content produced and edited by Cintron which was given to Martinez minutes before she was to present that content.

79.     This was far different than what Sanchez had described, was far more stressful, and was not "training" at all, but more like a means to set Martinez up for failure.

80.     Martinez left on the first day of "training" -- there was no "training" as it was just Cintron denying Martinez the opportunities / benefits provided to very experienced on air talent for this type of show with all new segments and content, no opportunity to pre-record, all done live on air for the first time – yet was still paying her like an intern.

81.     She emailed Sanchez and advised him she had left the training given the way she felt she was being treated by Cintron – Martinez felt Cintron was purposefully trying to embarrass her on air by putting her in the situation she did.

82.     Sanchez responded via email that Cintron "did you a favor" and stated while it was to be just music she would have to be ready for things to change, sudden breaking news, etc.

83.     Martinez understands being ready, that news can break, and one should be ready, but not during one's "training" – at this point Martinez saw the writing on the wall, as Biaggi was released, she was being moved to a new show (afternoon and evening – she was to cover two different shifts, she was the *only* weekly talent doing 6 hours a day on a part time 30k/year salary with no benefits), not to mention she was putting in extra hours daily by arriving early and leaving late.

84.    Late December 2016, Sanchez called and finally offered Martinez a full-time position but with only a $38,000 base salary, with benefits with a six (6) hours shift from 4pm to 10pm.

85.    Sanchez explained that was the only available budget he had for Martinez with the new shift. Martinez was executing the traffic and weather segments from 4pm to 7pm; and hosting from 7pm to 10pm.

86.    Early January 2017 during the beginning of El Zol 107.9 programming meeting, Cintron blatantly stated "the Puerto Rican on-air talent concerns were finally addressed"; referring to the amount of weekly Puerto Rican on-air talent during 2016 (with Biaggi gone, Martinez was the only Puerto Rican on air talent left).

87.    Martinez was surprised and offended by this negative and racist comment coming from Cintron.

88.    Also in January 2017, Sanchez and Cintron coordinated the Company's 2017 line-up presentation for the sales department and bigger clients.

89.    Martinez was the only on-air talent not invited by Sanchez and Cintron. She was also the only Puerto-Rican on air talent at that point (all others had been fired or "laid off" – told there was no budget, restructuring, etc).

90.    All weekday on-air talent was invited and introduced their show to the sales department and big clients.

91.    Martinez learned of the presentation from a sales department co-worker that asked her why she didn't show up to present her show.

92.     Mid-January 2017, Martinez followed up about the status of her contract with Sanchez and he confirmed it was still processing; yet by that time all other weekday talent had their contracts signed and filed with upper management.

93.     Late January 2017, Martinez received her first contract draft for revision and signature; she was pressured to hurry up and told she had only a couple of days to review it.

94.     Martinez felt Sanchez didn't provide the same amount of time to review and analyze her annual contract as the rest of the weekday talent.

95.     The third revised contract submitted as the final draft was never returned to Martinez as confirmation of her new full-time shift, benefits and salary.

96.     Martinez kept working with the part-time compensation assigned from 2016 waiting for the contract and the changes to her salary.

97.     In March 2017, a snowstorm was moving to the area and upper management instructed programming directors to coordinate and make arrangements with respective on-air talent (afternoon, evening and morning shows) to stay close to the Station and provide them proper safety.

98.     Other Stations on-air talent was provided with hotel reservations a block away.

99.     For El Zol 107.9, Cintron made hotel reservations only for the afternoon and morning on-air talent (none of whom are Puerto Rican); No one never contacted Martinez.

100.    Martinez showed up one hour before her shift to ask Sanchez and/or Cintron about the CBS/Entercom snowstorm arrangements for on air talent, but they were both gone.

101.    Right after, via email Sanchez advised her to stay until 8pm and pre-record the last two hours of the show and then go home.

102.    Later that evening, during her shift, Martinez discovered about the hotel reservations for her co-workers from the morning or afternoon shifts, and she was surprised her safety was not considered; especially when the snowstorm was expected to hit DC at 8pm *during Martinez's shift* (the others could be long gone and home before the storm hit, yet they were provided hotel reservations).

103.    The Next day, Martinez approached Sanchez to know the Company procedures regarding inclement weather.

104.    Sanchez stated hotel arrangements are provided only for full-time employees, and confirmed Cintron was responsible for those arrangements.

105.    Sanchez, when making that statement, clearly had forgotten that the afternoon on air talent filling in for Henry F., a Mr. Juan R., was provided a hotel room and is part time.

106.    There was one other on air talent that was not provided a hotel room, Sandee B., but she was on mid-day and lived one block away.

107.    In April 2017, Martinez further discovered she was suffering disparate treatment when she learned that while she was required to execute traffic and weather segments from El Zol 107.9's main studio, *all other traffic and weather reporters* (**none** of whom were Puerto Rican) were allowed to do so from a private studio in the office (each station has a main studio and an ancillary studio).

108.    As Martinez was live with the PM Drive host – as instructed - she converted into the *PM Drive co-host* while *prepping her traffic and weather segments twice an hour*; and also *prepping for her show from 7pm to 10pm*.

109.    At that time, Martinez was overloaded and working three times as much as other on-air talent. The rest of her coworkers doing traffic and weather segments for other Stations were

male, Caucasian, *full-time* and producing their segments pre-recorded in a private studio sending material twice an hour to main studios (a much less stressful environment).

110.    When she first took the job, she was under the impression that all the traffic and weather reporters were in the main studio during the show, and when they asked her to help Henry F. with his Spanish and play PM Drive co-host they sold it as an opportunity for Martinez to get more exposure which would be great for her career.

111.    In truth, they were exploiting Martinez, demanding she perform work for which she was not hired and thus get that work performed for free.

112.    The other stations traffic and weather reporters were receiving well compensated full-time positions, annual contracts ($60k+) and benefits – none of them were Puerto-Rican.

113.    Simultaneously, and after waiting for her pending 2017 contract and the pro-rated salary, Martinez felt the disparate treatment not only as traffic and weather reporter but also as on-air talent as well.

114.    Martinez was the only weekday on-air talent for El Zol 107.9 working six hours, with a part-time contract and no benefits, not to mention the extra time she was putting in at the station. She was also the *only* Puerto Rican on air talent.

115.    All weekday on-air talent from El Zol 107.9 were working 4-5 hours during their shifts, with well compensated full-time positions, annual contracts and benefits.

116.    In June 2017, Martinez requested a meeting with Sanchez and Cintron to discuss the disparate treatment she was experiencing which was becoming more and more evident. She raised the possibility of producing the PM Drive traffic and weather segments from a private studio (as is done by all others), and reiterated her concerns that all other on air talent were allowed to do so, and none of them had a second show to produce. Martinez also inquired about the status of her

annual contract with the Station – pointing out that all of the other on air talent had signed contracts for months, and here it was June of 2017, on top of the fact she *never* had a 2016 contract.

117.    Martinez interest was to join the main studio at 7pm for her evening shift after producing the traffic and weather segments and also doing a proper "show-prep" from 4pm to 7pm.

118.    Cintron stated the contract may not happen because of the submitted revisions and also the transition / merger between CBS Radio and Entercom.

119.    Regarding the request to be in a private studio during the traffic and weather segments, Cintron approved and said she would communicate that to Sanchez.

120.    In August 2017, Sanchez and Cintron requested a meeting with Martinez to terminate her due to alleged part-time budget cuts following the merger from the new Company, Entercom.  This was an excuse to terminate Martinez's employment as they were finally going to get rid of the last Puerto Rican on air talent at El Zol 107.9.

121.    Sanchez stated that other part-time employees such as DJ's and board operators will be affected as well.

122.    Curiously (revealingly), on 8.1.17, Martinez received a group email from Sanchez welcoming a new part-time member to the El Zol 107.9 team – and the new member was not Puerto Rican (Jose S.).

123.    On 8.5.17, Sanchez sent another group email, this time making it appear as though Martinez was voluntarily leaving and would continue to work for the company "in a freelance capacity covering on air shifts as needed."

124.    This was strange, as Sanchez had said nothing of the sort to Martinez about freelancing.

125.   Martinez went to HR for a letter reflecting her separation from the company, as she had not received one.  Conveniently, Sanchez was "on vacation" and could not be reached.

126.   Martinez, recognizing that Sanchez was deviously scheming to avoid unemployment by sending the "she will be freelancing" email, not providing Martinez with a letter of separation, and being on vacation (thus unavailable if she requested one), all in hopes Martinez left and when the unemployment commission contacted them he could produce the email and say she chose to leave but agreed to do some freelancing.

127.   Martinez was ultimately replaced by Parker from the morning show, who is male and not Puerto Rican.

128.   Martinez was an employee of CBS Radio / Entercom / from October 2015 until August 2017.  After her audition in September of 2015, she was offered a full time job with full benefits at $50k/year.  Yet, for the two years she was strung along at no time was she ever considered anything more than a part time employee, she was repeatedly denied the benefits she was promised, was repeatedly denied the salary she was promised, was discriminated against on the basis of her race / ethnicity with respect to her duties, assignments, compensation and responsibilities, and was retaliated against for engaging in protected activity, i.e. complaining about how she was being treated.

129.   During her employ, Martinez recorded several ad spots for which she was to be paid.  This compensation is considered wages per D.C. Code § 32-1301(3).

130.   The Defendant has its "on-air talent" sign paperwork authorizing the use of their voice / likeness, even beyond their employ.

131.   Plaintiff recorded several "endorsements" each month, and was paid for them while Martinez was employed.

132.    Once Martinez was terminated, Entercom was no longer entitled to use her voice and likeness, and Martinez never signed any "paperwork" authorizing Entercom to do so. Entercom has continued to this day, as of the filing of this Complaint, to use her recorded ad spots, gained the benefit of her voice and likeness, and not compensated her for said use.

133.    Entercom profited from the use of Plaintiff's voice and likeness.

134.    Entercom benefited from the value of Plaintiff's voice and likeness, as said value is due to Plaintiff given her line of work in the Spanish radio industry, where she intends to work in the future.

135.    As Martinez never signed paperwork with her employer, she further never relinquished rights to the name of her evening radio show, which she came up with, which incorporates her name, and which she intend to use in the future … *Omy De Noche* ("Omy At Night").

### Count I

### Discrimination (race / ethnicity) per §1981.

136.    Plaintiff reincorporates by reference all the allegations above.

137.    Defendant intentionally discriminated against Plaintiff Martinez on account of her ethnicity, Puerto Rico, in violation of 42 U.S.C. § 1981 by denying her equal terms and conditions of employment and/or by terminating her.

138.    Plaintiff's discrimination was not experienced by other non-Puerto Rican employees of the Defendant.

139.    Defendant intentionally interfered with Plaintiffs contract of employment because of its discriminatory animus towards her ethnicity. Defendants acted in a willful and wanton manner and in callous disregard for the federally-protected rights of the Plaintiff.

140.     As a direct and proximate result of Defendant discriminatory actions, Plaintiff has suffered and is suffering considerable injury, including but not limited to loss of substantial past and future salary and income, benefits and other privileges and entitlements of employment, loss of professional status and career enhancing and advancement opportunities and loss of retirement savings and benefits. The Plaintiff has also suffered from emotional distress arising from the loss of her job, the damage to her professional reputation and the embarrassment, humiliation, and indignity arising from the discriminatory conduct of Defendant and/or agents or employees acting on its behalf, and the stress and anxiety caused by her wrongful termination and resultant financial hardship.

141.     As a consequence, Defendant is additionally liable for attorney's fees and other costs and interest in pursuit of this litigation.

## COUNT II
## Hostile  work Environment per § 1981

142.     Plaintiff alleges and incorporates all the paragraphs above.

143.     Defendant created a hostile work environment and/or harassed Plaintiff because of her ethnicity, Puerto Rican, the offending conduct was unwelcome, was based on her ethnicity, was sufficiently server or pervasive when it altered the conditions of her employment and created an abusive work environment and was imputable to her employer.

144.     The affirmative defense of *Faragher*[1] and *Ellerth*[2] allows an employer to avoid strict liability for a supervisor's harassment of an employee if no tangible employment action was

---

[1] *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)
[2] *Burlington Indus., Inc., v. Ellerth*, 524 U.S. 742 (1998)

taken against the employee. Examples of tangible employment action include discharge, demotion, or undesirable reassignment.

145.    Plaintiff here suffered tangible employment actions from her supervisor when she was unable to perform her job because of the harassment when she was reassigned, given the duties of several employees, paid less than part time, worked more than full time, denied the same conditions as others performing similar tasks, denied the same special benefits of those not in her protected class (eg. hotel room during a snow storm) demoted and/or stripped of all her employment duties and/or when she was subsequently terminated. As a result, vicarious liability is absolute.

146.    As a direct and proximate result of this injury from the Defendant, Plaintiff has suffered and is suffering considerable injury, including but not limited to loss of substantial past and future salary and income, benefits and other privileges and entitlements of employment, loss of professional status and career enhancing and advancement opportunities and loss of retirement savings and benefits. The Plaintiff has also suffered from emotional distress arising from the loss of her job, the damage to her professional reputation and the embarrassment, humiliation, and indignity arising from the discriminatory conduct of Defendant and/or agents or employees acting on its behalf, and the stress and anxiety caused by her wrongful termination and resultant financial hardship.

147.    The environment was severe and pervasive enough to change the conditions of Plaintiff's employment with Entercom, having to regularly hear senior persons complain about her accent, her pronunciation of certain letters and words, and having all of it associated with her ethnicity – Puerto Rican.

148.     As a consequence of Defendant's action, it is additionally liable for attorney's fees and other costs and interest in pursuit of this litigation.

## COUNT III

## RETALIATION § 1981

149.     Plaintiff alleges and incorporates all the above paragraphs.

150.     Plaintiff engaged in protected activity and opposition to practices made unlawful under Section 1981 while employed by the Defendant.

151.     Plaintiff also subjectively believed that she was complaining about discrimination directed at her ethnicity.

152.     As a result of her protected activity and opposition to practices made unlawful under Section 1981, Plaintiff was subjected to an adverse employment action, up to and including termination.

153.     A casual connection exists between Plaintiff's protected activities and the adverse employment actions taken by Defendant.

154.     As a direct and proximate result of this injury from the Defendant, Plaintiff has suffered and is suffering considerable injury, including but not limited to loss of substantial past and future salary and income, benefits and other privileges and entitlements of employment, loss of professional status and career enhancing and advancement opportunities and loss of retirement savings and benefits. The Plaintiff has also suffered from emotional distress arising from the loss of her job, the damage to her professional reputation and the embarrassment, humiliation, and indignity arising from the discriminatory conduct of Defendant and/or agents or employees acting on its behalf, and the stress and anxiety caused by her wrongful termination and resultant financial hardship.

155.    As a consequence of Defendant's action, it is additionally liable for attorney's fees and other costs and interest in pursuit of this litigation.

## COUNT IV
### Violations of the D.C. Wage Payment and Collection Law D.C. Code § 32-1301, et seq

156.    Plaintiff alleges and incorporates all the above paragraphs.

157.    Under the D.C. Wage Payment and Collection Law (WPCL), every employer shall pay all wages earned to their employees at least twice during each calendar month, on regular paydays designated in advance by the employer; provided, however, that an interval of not more than 10 working days may elapse between the end of the pay period covered and the regular payday designated by the employer.

158.    Under the D.C. Wage Payment Collection Law, § 32-1301 (3) wages are broadly defined to include, monetary compensation owed "for labor or services rendered, whether the amount is determined on a time, task, piece, commission or other basis of calculation." It then goes on to define wages as bonus'; commissions; fringe benefits; overtime premium; other remuneration promised or owed, pursuant to an oral or written contact for employment; pursuant to a contract between an employer and another person or entity; and pursuant to District or federal law.

159.    Defendant's violated the D.C. Wage Payment Collection Law when it withheld wages from the Plaintiff by failing to pay her in a timely manner. There is also no bona fide dispute that the Plaintiff has earned her wages in the minimum amount of $50,000.00 from the Defendant for work already performed, yet that sum has not to date been paid.

160.    Due to Defendant's violations, the Plaintiff is entitled to her hourly compensation and liquidated damages in treble the amount of unpaid wages, pursuant to D.C. Code § 32-

1308(a)(1)(A)(ii), her attorney's fees and costs, statutory penalties, and all other relief under the D.C Wage Payment and Collection Law, D.C Code § 32-1301 *et seq.*

## Count V

### **Misappropriation of Likeness**

161.    Plaintiff reincorporates by reference all the allegations above

162.    Following Plaintiff's separation from the Defendant's employ, the Defendant, without authorization from Plaintiff, continued to use her likeness, voice and name to run endorsements for advertisers on the radio network.

163.    Defendant profited from running the endorsements that made use of (and continue to make use of)  Plaintiff's voice, name and likeness.

164.    Defendant was not authorized to use Plaintiff's voice, name or likeness.

165.    Defendant's name, voice and likeness have value to her, given her past work history and intentions for the future.

166.    Under the common law, Plaintiff is entitled to injunctive relief, damages - both compensatory and punitive, attorney's fees, and any other relief this Court sees fit.

## Count VI

### **Violation of the DC Human Rights Act – Race, Gender, Ethnicity, National Origin**

167.    Plaintiff incorporates by reference the above allegations.

168.    Defendant's actions in discriminating against Plaintiff with respect to the conditions of her employment, her duties, her rate of compensation, whether she even received compensation, her benefits, and responsibilities in the workplace, violated he DC Human Rights Act.

169.    Plaintiff was treated differently, paid differently, and subjected to an offensive and insulting workplace on the basis of her gender, race, ethnicity and national origin, all in violation of the DC Human Rights Act.

170.    The Defendant's supervisory and high level officials engaged in the discriminatory behavior, said behavior was known to the human resources department, Plaintiff complained about the behavior, but the Defendant failed to do anything to address the discriminatory actions of its agents and employees.

171.    As a result of the discriminatory behavior and actions of the Defendant and its agents, all of which was based on Plaintiff's race, gender, ethnicity and / or national origin, she has suffered great emotional distress, suffered discriminatory pay practices, was repeatedly refused even paperwork for her position, was repeatedly lied to about her position, the level of compensation, that it was full time, that there were benefits, and further she never received those benefits or the promised salary, and had her title removed, duties changed, was required to work in worse conditions than others similarly employed – who were paid better, employed as full time employees and paid much greater salaries ($60,000 and up).

172.    Defendant denied Plaintiff her right to be paid as the men employed as on air talent, the same as the non-Puerto Rican on air talent, to receive benefits like the other on air talent, to be allowed to pre-record shows as the other on-air talent, to be allowed to do so from a private studio, to have a written employment contract, and to all the other benefits of the position such as a hotel room during snowstorms.

173.    Under the DC Human Rights Statute Plaintiff is entitled to damages – compensatory and punitive, costs, attorney's fees, injunctive relief, and any other relief the Court deems appropriate.

## DAMAGES AND RELIEF SOUGHT

**WHEREFORE**, the Plaintiff Omayra Martinez respectfully requests judgment in the amount of $5,000,000.00, as detailed below, as well as other relief requested below:

A.  Enter judgment for the Plaintiff Omayra Martinez against the Defendant on all counts;

B.  Award the Plaintiff punitive damages sufficient to punish the Defendant and deter others, where applicable;

C.  Order Defendant to pay Plaintiff all unpaid wages as defined by D.C. Code § 32-1301(3) and identified in D.C. Code § 32-1311(c)(4), and per D.C. Code § 2-1303.13(a)(1)(D), including but not limited to full back pay and front pay, including salary, benefits, entitlements, loss of professional status and career-enhancing opportunities, bonuses', cash awards, loss of retirement savings and benefits and other remuneration and privileges of employment retroactive to the date of any unlawful employment action found to have occurred in this case.

D.  Award the Plaintiff compensatory damages for emotional distress injuries and loss;

E.  Order Defendant to pay all reasonable attorney's fees, court costs, expert fees, and expenses, incurred by Plaintiff as a result of Defendants' actions and inactions per the common law, D.C. Code § 32-1308 (a)(1)(A) and D.C. Code § 32-1311(c)(4), D.C. Code § 2-1303.13(a)(1)(E) and (F), or as otherwise allowed by law, as well as pre-judgment and post-judgment interest;

F.  Order Defendant to pay liquidated damages equal to treble the amount of unpaid wages ($75,000.00 x 3 = $225,000.00) per D.C. Code §32-1308(a)(1)(A)(ii);

G.  Order Defendant to pay a statutory civil penalty of $10,000.00 per D.C. Code § 32-1311(c)(1), award liquidated damages to Plaintiff equal to that amount per D.C. Code § 32-1311(c)(3), and enter an order enjoining the Defendant from engaging in the violations of law pled herein per D.C. Code § 32-1311(c)(2) and (6).

H.  Order Defendant to pay a statutory penalty of between $10,000 and $50,000 per D.C. Code § 2-1303.13(a)(1)(E-1).

I.  Order that *for each day* Defendant failed / continues to fail to pay Plaintiff the wages due and earned in violation of D.C. Code § 32-1303(1) and (3), Order Defendant to pay as liquidated damages 10% of the $75,000.00 in unpaid wages ($7,500.00 x 220 work days = $1,800,000.00), or treble the amount $75,000.00 x3 = $225,000.00), whichever is smaller, as allowed by D.C. Code § 32-1303(4);

J.  Enjoin Defendant from any future use of Plaintiff's name, voice or likeness, and Order Defendant to compensate Plaintiff for the use thereof since her separation from

Defendant's employ, and to base said damages on the profits earned by Defendant while using her likeness.

K. Order any and all other such other equitable and legal relief as the Court deems just and appropriate.

### **JURY TRIAL DEMANDED**

Plaintiff demands a jury trial for this action for all claims so triable.

Respectfully submitted.

**OMAYRA MARTINEZ**

By Counsel,

**THE BROWN FIRM PLLC**


By:   ___/s/_____
     Christopher E. Brown, Esq.
     DC Bar No 458897
     526 King St. Suite 213
     Alexandria, VA 22314
     Tel: 703-924-0223
     Fax: 703-997-2362
     cbrown@brownfirmpllc.com
     *Counsel for Plaintiff Martinez*

**DHALI PLLC**


By:   ___/s/_____
     Arinderjit "AJ" Dhali, Esq.
     1828 L. Street. NW. Suite 600
     Washington D.C. 20036
     T: (202) 556 - 1285
     F: (202) 351-0518
     ajdhali@dhalilaw.com
     *Co-Counsel for Plaintiff Martinez*