**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| OMAYRA MARTINEZ, | |
| *Plaintiff*, | |
| v. | Civil Action No. 1:19-cv-01490 (CJN) |
| ENTERCOM COMMUNICATIONS CORP., *also known as* ENTERCOM, | |
| *Defendant*. | |

## MEMORANDUM OPINION

After a short career as a host on a Spanish-language radio station, Plaintiff Omayra Martinez's employment was terminated by Defendant Entercom.  Martinez filed this suit a few years later, alleging that because of her Puerto Rican heritage she suffered discrimination, a hostile work environment, and retaliation; that she was underpaid; and that she had her likeness misappropriated after she left.  *See* Compl., ECF No. 1, at ¶¶ 136–73.  Entercom responded to Martinez's Complaint, ECF No. 7, and after the conclusion of discovery, filed a Motion for Summary Judgment ("Mot."), ECF No. 17.  Because Martinez has failed to respond to many of Entercom's legal arguments, and because the uncontroverted facts do not support her claims, the Court will grant the Motion.

### BACKGROUND

The Court finds no material dispute concerning the following facts, Fed. R. Civ. Proc. 56(a):

El Zol 107.9 is a Spanish-language radio station serving the Washington, D.C. metropolitan area.  *Compare* Def.'s Statement of Undisputed Material Facts ("Def.'s Facts"), ECF No. 17-2, at

¶ 1, *with* Pl.'s Opp. to Def.'s Mot. for Sum. Judg. ("Pl.'s Resp."), ECF No. 19, at 16 ¶ 1–4.[1]  It is one of many radio stations operated by Entercom in the D.C. area.  Def.'s Facts at ¶ 2.

One of El Zol's morning hosts in 2015 was Pedro Biaggi.  *Id.* ¶ 3.  In August of that year, he asked Martinez—who had worked at many Hispanic media outlets in the area, Transcript of Omayra Martinez ("Martinez Dep."), ECF No. 17-6, at 17:8–17—if she would audition to join him as a cohost, Def.'s Facts at ¶ 3.  Biaggi explained to Martinez that she would have to audition, interview, and get approval from the programming director, Robert Sanchez, in order to get the job.  *Id.* ¶ 4.

Martinez started the audition process in mid-September.  *Compare id.* ¶ 5 *with* Pl.'s Resp. at 16 ¶ 5.  The parties agree that, at a minimum, she knew she would not be paid during a two-week period of on-air auditions.  *Compare* Def.'s Facts ¶ 5 *with* Pl.'s Resp. at 16 ¶ 5.

Following those auditions, Martinez met with Biaggi, Sanchez, and Candy Cintron to interview for the position.  *Compare* Def.'s Facts ¶ 6 *with* Pl.'s Resp. at 16 ¶ 6, 2 ¶ A.  Cintron was the morning show's producer and an assistant programming director.  *Compare* Def.'s Facts ¶ 6 *with* Pl.'s Resp. at 16 ¶ 6, 2 ¶ A (not disputing Cintron's role).

After the audition process and interview, Martinez continued appearing on El Zol's morning show with Biaggi.  *Compare* Def.'s Fact ¶ 7 *with* Pl.'s Resp. at 16 ¶ 7.  It is undisputed that, at some point later, Sanchez told Martinez to stop coming to the station on her own; as

---

[1] Martinez failed to comply with Local Civil Rule 7(h)(1), which states that "[a]n opposition to [a motion for summary judgment] shall be accompanied by a *separate* concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated."  Local Civ. R. 7(h)(1) (emphasis added).  Instead, Martinez opted to include a fifteen-page "Statement of Additional Material Facts" in her Response Brief.  And Martinez further included, in that same brief, a separate section responding to Entercom's Statement of Undisputed Material Facts.  This section did not include the actual facts alleged by Entercom, only responses to them.  Accordingly, for ease of citation, the Court will cite only to Entercom's Statement of Undisputed Material Facts when Martinez does not dispute those facts.

Martinez testified, Sanchez told her that, "if you are coming to the station on your own, please don't do so." Martinez Dep. at 46:5–22. *Compare also* Def.'s Fact ¶ 7 *with* Pl.'s Resp. at 16 ¶ 7. Martinez notes that this was seven weeks after her first interview. Pl.'s Resp. at 16 ¶ 7.

Seeking clarification as to her status, on November 10, 2015, Martinez emailed Sanchez asking to "define [her] situation with the Station and [discuss] possible next steps." Martinez Dep. ex. 4 at 5. Sanchez responded that same day, informing Martinez that he was "waiting to hear back from corporate as to how much money I can offer for the position." *Id.* at 3. He informed her that he had sent another email "to corporate just now asking whether I can move forward to fill this position." *Id.* And he let Martinez know that he "had mentioned to [Cintron] a few weeks ago that I think you've done a great job auditioning, but that I didn't want you working for free. I've been surprised that you've continued to come in on your own after your audition period ended. Please don't feel that you have to keep coming to be considered for the job. If [Biaggi] has told you something different, please let us know." *Id.* at 4. He concluded the email by letting Martinez know that she was "a strong applicant and at a minimum I would like to get you on payroll—at least part-time for now while a final determination is made on what I am authorized to offer you." *Id.*

Martinez responded to this email with concern: she was "a little taken aback in learning that I'm still being considered a 'candidate' when I was under the impression that my week off was to work out the paperwork." *Id.* at 3. But she did not say that Biaggi had told her to keep coming in to the station. Instead, she wrote: "I returned and kept coming to the show solely to improve in my capacity; and to become more in tune with the team." *Id.* She did, however, have some reservations about the status of the contract: "[L]earning of the current situation makes me feel very unstable and without any guarantees. I certainly remain extremely interested and want

to be the person who fills this position." *Id.*  Sanchez responded regarding where they were in the process—she was the station's chosen candidate, but the station still needed approval to sign a contract.  *Id.* at 1.

On December 7, Martinez came back for a second interview.  Def.'s Facts ¶ 9.  Thereafter, Sanchez offered her a part-time position paying $30,000 a year without benefits.  *Id.*  Martinez thanked him and let him know that she would think it over.  *Id.* at ¶ 10.  But she made clear that she definitely wanted "to be part of the team."  *Id.*  Martinez eventually proposed various alternative employment options, such as working part-time as an on-air talent and part time in another department, like sales.  *Id.* ¶ 11.  All of this was laid out in a January 6, 2016, email that Martinez sent to Jessica Rodriquez Monro, the local sales director.  *Id.*  Monro informed Martinez verbally that Martinez's proposal was not acceptable.  *Id.*

Since the new year had rolled in, and Martinez had not yet accepted the offer of employment, Sanchez informed her that he had to wait for the 2016 budget before he could determine her salary.  Pl.'s Resp. at 6 ¶ F (not disputing that Sanchez said this, but disputing that he was telling the truth).  Sanchez did request the name of Martinez's company to compensate it for the time she had worked during the "7 week audition period."  *Compare* Def.'s Facts ¶ 13 *with* Pl.'s Resp. at 17 ¶ 13.  El Zol subsequently paid the full amount of the invoice it received from Martinez's business, and Martinez never told anyone that she disagreed with the amount of that payment.  *Compare* Def.'s Facts ¶ 14 *with* Pl.'s Resp. at 18 ¶ 14, 9 ¶ L.[2]

---

[2] Martinez claims that this fact is "Disputed."  Pl.'s Resp. at 18 ¶ 14.  She references only page 9, paragraph L of her Response Brief for support.  *See id.*  But that section does not contest any fact stated in this sentence.  *See* Pl.'s Resp. at 9 ¶ L.  Accordingly, the Court will treat this fact as conceded.  *See* Fed R. Civ. P. 56(c)(1).

On February 17, 2016, Sanchez informed Martinez by email that her "background check cleared and our internal approvals to bring you on part-time is also approved." Martinez Dep. ex. 11. at 1. The email offered her a position as a part-time employee, working 25 hours per week at a $23.50 hourly rate. *Id.* This annualized to $30,550 per year. *Id.* But the email also noted that she could be paid additional hours for doing certain other preapproved tasks. *See id.* at 1–2. Sanchez concluded by letting Martinez know that, if she was "still interested in moving forward with this, [she] could start as soon as next week if [she was] able to attend the new hire orientation on Monday morning February 22nd." *Id.* at 2. Martinez accepted and attended this orientation. Def.'s Facts at ¶ 16.

After she started, Martinez began receiving feedback from Cintron. *Compare* Def.'s Facts ¶ 17 *with* Pl.'s Resp. at 18 ¶ 17. It is undisputed that Cintron told Martinez that she needed to slow down her cadence and enunciate her words. *Compare* Def.'s Facts ¶ 17 *with* Pl.'s Resp. at 18 ¶ 17. It is undisputed that Cintron—who, like Martinez, identifies as Puerto Rican—told Martinez that she needed to be "more Puerto Rican." [3] *Compare* Def.'s Facts ¶ 17 *with* Pl.'s Resp. at 18 ¶ 17. It is also undisputed that Martinez never told Cintron that her feedback offended Martinez, nor that Martinez thought that it was based on Martinez's Puerto Rican heritage. *Compare* Def.'s Facts ¶ 18 *with* Pl.'s Resp. at 18 ¶ 18. Indeed, Martinez noted that Cintron would correct other individuals' use of Spanish words and language. Pl.'s Resp. at 18 ¶ 18. [4]

---

[3] Martinez clarifies that Cintron is what she calls "Nuyorican"—one of Puerto Rican heritage from New York City. *See* Martinez Dep. 106:9–16. Unlike her, Martinez claims, Nuyoricans are strong and aggressive. *Id.*

[4] In her opposition, Martinez claims that she "testified that Cintron harassed her for being 'too Puerto Rican.'" Pl.'s Resp. at 18 ¶ 17. The excerpt from her deposition that she cites for this reads: "Girl, you're too Puerto Rican. You need to slow down talking. You need to pronounce your 'Rs.'" Martinez Dep. at 105:20–21.

Nearly a year after Martinez started at El Zol, the station underwent some organizational changes. Def.'s Facts at ¶ 19. It decided not to renew Biaggi's contract, opting instead to have his former cohost run the morning show. *Id.* Around this same time, Martinez was moved from the morning show to afternoon and evening segments. *Compare* Def.'s Facts ¶ 20 *with* Pl.'s Resp. at 18 ¶ 20, 6–8 ¶¶ H–I. This new position required additional training. *Compare* Def.'s Facts ¶ 20 *with* Pl.'s Resp. at 18 ¶ 20, 6–8 ¶¶ H–I. Martinez claims that she felt ambushed by Cintron during this training, being instructed to go live on the air with little warning and without time to do necessary research. *See* Pl.'s Resp. at 7–8 ¶ I. It is undisputed that, as a result of this experience, Martinez became frustrated and walked off the job, leaving Cintron to cover her job duties. *Compare* Def.'s Facts ¶ 20 *with* Pl.'s Resp. at 18 ¶ 20, 6–8 ¶¶ H–I. Martinez does not claim that Cintron took these actions because of Martinez's Puerto Rican heritage. *See* Pl.'s Resp. at 7–8 ¶ I.

Despite this hiccup, Sanchez encouraged Martinez to apply for a fulltime role that had recently opened up. *Compare* Def.'s Facts ¶ 22 *with* Pl.'s Resp. at 18 ¶ 22, 6–8 ¶¶ H–I. She did and was accepted for the position—contingent, however, upon her executing an employment contract. Def.'s Facts at ¶ 23.

Sanchez sent Martinez a draft contract in January 2017. *Compare* Def.'s Facts ¶ 24 *with* Pl.'s Resp. at 18 ¶ 24, 6–14 ¶¶ H–M, O, P, T–V.[5] Over the next two months, she sent the contract back with revisions three times. *Compare* Def.'s Facts ¶ 25 *with* Pl.'s Resp. at 18 ¶ 25, 6–14 ¶¶ H–M, O, P, T–V.[6] The contract was never ultimately executed. *See* Pl.'s Resp. at 14 ¶ V.

---

[5] Again, while Martinez broadly asserts that this fact is "[d]isputed" and cites to a broad swath of pages in support, nothing she cites disputes that Sanchez sent her a contract in January 2017. Indeed, one of the paragraphs *admits* that this is the case. *See* Pl.'s Resp. at 10 ¶ O. The Court will therefore treat this fact as undisputed. *See* Fed. R. Civ. P. 56(c)(1).

[6] Once again, while Martinez broadly asserts that this fact is "[d]isputed" and cites to many pages in support, nothing she cites disputes that she sent the contract back with revisions multiple times. One of the paragraphs she cites actually discusses that the contract *did* go back and forth in a

During this back and forth on the contract's terms, El Zol received a directive from its then-parent company, CBS Radio Inc., to find ways to cut costs in advance of CBS's sale to Entercom. *Compare* Def.'s Facts ¶ 26 *with* Pl.'s Resp. at 19 ¶ 26, 10–13 at ¶¶ O–T.[7]  Sanchez responded on March 28, informing his superiors that he had found a way to cut about 5 percent in costs. *Compare* Def.'s Facts ¶ 26 *with* Pl.'s Resp. at 19 ¶ 26, 10–13 at ¶¶ O–T.[8]  One of these options included eliminating Martinez's shift.  *Compare* Def.'s Facts ¶ 26 *with* Pl.'s Resp. at 19 ¶ 26, 10–13 at ¶¶ O–T; *see also* n.8, *supra*.  And a little over a week later, Sanchez informed HR that the station was going to decline to move forward with contract negotiations with Martinez, in addition to eliminating her shift and laying off another employee.  *Compare* Def.'s Facts ¶ 26 *with* Pl.'s Resp. at 19 ¶ 26, 10–13 at ¶¶ O–T; *see also* n.8, *supra*.

A few months later, in June 2017, Martinez "spoke for the first time openly about the discrepancies on the treatment" she believed that she had received.  Martinez Dep. at 342:18–19; *compare* Def.'s Facts ¶ 29 *with* Pl.'s Resp. at 19 ¶ 29, 9 at ¶ L, 11–14 at ¶¶ Q–S, U.[9]  And a month

---

process of revisions.  *See* Pl.'s Resp. at 10 ¶ O.  The Court will treat this fact as undisputed.  *See* Fed. R. Civ. P. 56(c)(1).

[7] Yet again, Martinez broadly asserts that this fact is "[d]isputed" and cites a broad range of pages in support.  But nothing she cites disputes this fact.  Indeed, several of the paragraphs she cites to "dispute" the facts in paragraph 26 of Defendant's Statement of Undisputed Material Facts have absolutely nothing to do with the facts contained in that paragraph.  The Court will again treat this fact as undisputed.  *See* Fed. R. Civ. P. 56(c)(1).

[8] Martinez claims to also dispute this fact, her citations in support actually admit it to be true.  *See* Pl.'s Resp. at 12–13 ¶ O.  The Court will accordingly treat this fact as undisputed.  *See* Fed. R. Civ. P. 56(c)(1).  Rather than repeat this footnote every time the Court summarizes a fact that Martinez purports to dispute, but in fact cites only record evidence that does not contest, or even supports, that fact, the Court will simply cite this footnote.

[9] Martinez claims that, in December 2015, she complained to a member of HR that "she felt she didn't have her contract yet because she was being discriminated against on account of her gender and Puerto Rican nationality."  Pl.'s Resp. at 9 ¶ L.  She cites two pieces of evidence for this: "Ex. 2 at 219:2–220:6; Ex. 16 at p18 Plaintiff's ATI No. 14."  *Id.*  But there is no page 219 or 220 included in Plaintiff's Exhibit 2.  And while the second citation does exist, it only states that

later, on July 31, Martinez met again with Cintron, Sanchez, and a member of HR.  *Compare* Def.'s Facts ¶ 30 *with* Pl.'s Resp. at 19 ¶ 30, 8–13 at ¶¶ J, K,M–T; *see also* n.8, *supra*.  Sanchez informed Martinez that, due to budget cuts, she was being let go.  *Compare* Def.'s Facts ¶ 30 *with* Pl.'s Resp. at 14 ¶ V; *see also* n.8, *supra*.  But he did offer her a chance to record voiceovers at a flat fee of $800 per month, and he indicated that she could stay on the payroll to pick up any shifts that opened up.  *Compare* Def.'s Facts ¶ 31 *with* Pl.'s Resp. at 19 ¶ 31, 8–13 at ¶¶ J, K,M–T; *see also* n.8, *supra*.

Martinez testified that Sanchez and Cintron "were saying that they really want to keep me and they don't want to lose me as a talent, they really wanted to keep me, they were, like, struggling because this was happening and they felt bad about it."  Def.'s Facts at ¶ 33 (quoting Martinez Dep. at 322:5–10).  But still, after receiving the news, she asked for a meeting with station executive Steve Swenson.  *Compare* Def.'s Facts at ¶ 34 *with* Pl.'s Resp. at 19 ¶ 34.  Martinez asked Swenson why her position was being eliminated.  *Compare* Def.'s Facts at ¶ 34 *with* Pl.'s Resp. at 19 ¶ 34.  He told her the main reasons were that they were selling the company and they had not yet completed her contract.  *Compare* Def.'s Facts at ¶ 34 *with* Pl.'s Resp. at 19 ¶ 34.  Swenson wished her the best, and an HR representative provided her with a separation agreement.  *Compare* Def.'s Facts at ¶ 34 *with* Pl.'s Resp. at 19 ¶ 34.

---

Martinez's first complaint was "to HR Manager, Jane Lambert, in her office about not being paid for the initial months of work and following up about my pending paperwork and contract.  Verbal complaint."  ECF No. 19-19 at *18.  It does not mention any claim that Martinez was being discriminated against on account of either her gender or Puerto Rican nationality.  Martinez has thus failed to establish this fact.  *See* Fed. R. Civ. P. 56(c)(1).  Martinez also claims that, in June 2016, she emailed Sanchez and Cintron to discuss her concerns of disparate treatment.  *See* Pl.'s Resp. at 13 ¶ U.  But again, none of the citations she provides show that to be the case.  Again, Martinez has failed to establish this fact.  *See* Fed. R. Civ. P. 56(c)(1).

Since leaving El Zol, Martinez has heard recordings of her voice played on the station. She testified that these recordings were produced during her time at El Zol. *Compare* Def.'s Facts ¶ 40 *with* Pl.'s Resp. at 20 ¶ 40, 15–16 at ¶ Y; *see also* n.8, *supra*.

Before continuing, a brief aside about an earlier event. In March 2017, a large snowstorm hit Washington, D.C. Pl.'s Facts at ¶ 35. At this time, Martinez lived in D.C, just a few miles away from the station. *Id.* Martinez ended up getting a ride home from a coworker, despite the snow. *Compare* Def.'s Facts ¶ 36 *with* Pl.'s Resp. at 19 ¶ 36, 11–12 at ¶¶ Q–S; *see also* n.8, *supra*. Many other employees, however, were offered hotel rooms, paid for by the station. *Compare* Def.'s Facts ¶ 37 *with* Pl.'s Resp. at 19 ¶ 37, 11–12 at ¶¶ Q–S; *see also* n.8, *supra*. The next day, Martinez confronted Sanchez about this. *Compare* Def.'s Facts ¶ 38 *with* Pl.'s Resp. at 19 ¶ 38, 11–12 at ¶¶ Q–S; *see also* n.8, *supra*. He told her, she testified, that the individuals were placed in hotels "because they lived in Virginia and they were not living in D.C." Martinez Dep. at 233:18–21; *compare also* Def.'s Facts ¶ 37 *with* Pl.'s Resp. at 19 ¶ 37, 11–12 at ¶¶ Q–S. But Martinez believed she was not offered a hotel room because she was a Puerto Rican woman. *Compare* Def.'s Facts ¶ 38 *with* Pl.'s Resp. at 19 ¶ 38, 11–12 at ¶¶ Q–S; *see also* n.8, *supra*.

## PROCEDURAL BACKGROUND

Martinez filed suit a little less than two years after being let go. *See generally* Compl., ECF No. 1. She brings six separate claims. Three are based on 42 U.S.C. § 1981: discrimination on the basis of her race and ethnicity, *see id.* ¶¶ 136–41; hostile work environment, also based on her Puerto Rican identity, *see id.* ¶¶ 142–48; and retaliation for complaining about discrimination directed at her ethnicity, *see id.* ¶¶ 149–55. She also alleges a violation of the D.C. Wage Payment and Collection Law, D.C. Code § 32-1301, *et seq. See* Compl. ¶¶ 156–60. And she alleges that

Entercom has misappropriated her likeness.  *See id.* ¶¶ 161–66.  She further alleges a claim of racial and gender discrimination under the D.C. Human Rights Act, D.C. Code § 2-1401 *et seq.*

After filing an Answer, ECF No. 7, and conducting discovery, Entercom filed this Motion for Summary Judgment, ECF No. 17.

LEGAL BACKGROUND

### A.  Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The "mere existence of a scintilla of evidence in support" of a factual dispute, however, will not suffice. *Id.* at 252.  "When the moving party does not bear the burden of persuasion at trial, its burden may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  *Bell v. E. River Fam. Strengthening Collaborative, Inc.*, 480 F. Supp. 3d 143, 149 (D.D.C. 2020) (quoting *Mokhtar v. Kerry*, 83 F. Supp. 3d 49, 60–61 (D.D.C. 2015)).  Once that showing is made, it is up to the nonmoving party to lay out "specific facts showing that there is a genuine issue for trial."  *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

"Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (quoting *Anderson*, 477 U.S. at 255).  But that does not mean that a court must blindly accept any claimed "fact."  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury

10

could believe it, a court should not adopt that version of the facts for the purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

In the context of discrimination cases, "summary judgment must be approached with specific caution." *Baylor v. Powell*, 459 F. Supp. 3d 47, 53 (D.D.C. 2020) (quoting *Pollard v. Question Diagnostics*, 610 F. Supp. 2d 1, 17 (D.D.C. 2009)). Yet that does not mean that "a plaintiff is [ ] relieved of [her] obligation to support [her] allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Id.* She must still point to evidence, ideally beyond her own conclusory declarations. "Summary judgment for a defendant is most likely when a plaintiff's claim is supported solely by the plaintiff's own self-serving, conclusory statements." *Bell*, 480 F. Supp. 3d at 149 (quoting *Bonieskie v. Mukasey*, 540 F. Supp. 2d 190, 195 (D.D.C. 2008)). But even then, the Court must view the evidence in the light most favorable to the nonmoving party, drawing all reasonable inferences in her favor. *Johnson v. Perez*, 823 F.3d 701, 705 (D.C. Cir. 2016).

### B.  42 U.S.C. § 1981 and the District of Columbia Human Rights Act

Martinez brings claims under both § 1981 and the District of Columbia Human Rights Act. Section 1981(a) guarantees "[a]ll persons . . . the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). It thus "offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006). The Supreme Court has expanded it to cover claims of retaliation, too. *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 446 (2008).

Race-discrimination claims under § 1981 can be proven by either direct or indirect evidence. *See Deppner v. Spectrum Health Care Res., Inc.*, 325 F. Supp. 3d 176, 187 (D.D.C.

2018).  An employee has direct evidence of unlawful discrimination in circumstances when, for example, "the employer overtly refer[s] to the employee's protected trait when making an unfavorable employment decision."  *Id.* (quotation omitted).  A clear link must exist between the evidence of discrimination and the unfavorable employment decision for the evidence to constitute direct rather than indirect evidence of discrimination.  *Vatel v. Alliance of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011); *Lemmons v. Georgetown Univ. Hosp.*, 431 F. Supp. 2d 76, 86 (D.D.C. 2006) ("Direct evidence of discrimination is evidence that, if believed by the fact finder, proves the particular fact in question *without any need for inference*." (quotation omitted) (emphasis in original)).

If a plaintiff offers no evidence of direct discrimination, "race discrimination claims under both the DCHRA and Section 1981 are evaluated using the same framework as claims arising under Title VII of the Civil Rights Act of 1996, 42 U.S.C. § 2000e, *et seq.*" *Richardson v. Petasis*, 160 F. Supp. 3d 88, 108 (D.D.C. 2015) (quoting *Lemmons.*, 431 F. Supp. 2d at 86); *see also Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013).   Thus, for purposes of summary judgment, the Court "must resolve one central question:  Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race . . . or national origin?"  *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).

Hostile-work-environment claims under § 1981, on the other hand, require a different showing.  To prevail, "a plaintiff must first show that he or she was subjected to discrimination, intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Ayissi-Etoh*, 712 F.3d at

577 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)) (quotations omitted).  On a motion for summary judgment, the Court must thus assess the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's performance at work.  *Id.* (quoting *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008)).  And if the harassment is coming from coworkers, the plaintiff must prove that the employer was negligent in not preventing or correcting it.  *Id.*

A retaliation claim under § 1981, however, is much like a discrimination claim.  The plaintiff must show that she engaged in protected activity and that her employer took an adverse employment action against her because of that activity.  *Id.* at 578.  But if the defendant offers a nondiscriminatory reason for the alleged retaliation, the plaintiff must show that to be mere pretext.  *Johnson v. Interstate Mgmt. Co.*, 849 F.3d 1093, 1099 (D.C. Cir. 2017).

### C.  D.C. Wage Payment and Collection Act

Under the D.C. Wage Payment and Collection Act, an employer must pay all wages earned by an employee on regular paydays at least twice each month.  D.C. Code. § 32-1302.  All payments must be made within ten working days after the end of a pay period.  *Id.*

### D. Misappropriation of Likeness

Misappropriation of likeness claims are difficult to establish under District law.  "[T]o state a cause of action, the plaintiff must allege, and later prove, that the defendant's commercial benefit was derived from the identity of the plaintiff and the value or reputation which the public associates with that identity."  *Tripp v. United States*, 257 F. Supp. 2d 37, 43 (D.D.C. 2003) (quotation omitted); *see id.* at 42 ("[I]t is clear that where the D.C. Court of Appeals has denied plaintiffs relief on a misappropriation of name or likeness theory, it has relied heavily on the lack of 'value'

associated with mention or use of the plaintiff's name or likeness.").  Thus, if a plaintiff fails to prove that her identity carries with it any special value, her claim must necessarily fail.

### I. SOME OF ENTERCOM'S EVIDENCE OBJECTIONS ARE MISPLACED

Before turning to the merits, the Court must first address a preliminary dispute between the parties.  On summary judgment, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).  Entercom levies several such objections.

### A. Cintron's statement that "the Puerto Rican issue at the station is finally addressed"

Martinez alleges that, after Biaggi was terminated at the end of 2016, Cintron stated in a meeting with Martinez and ten other coworkers that "the Puerto Rican issues were finally addressed."  Pl.'s Resp. at 9–10 ¶ M.  (Biaggi is of Puerto Rican heritage.)  Martinez cites three sources to support that this comment was made: her own deposition and declarations from two coworkers.  *See id.*

Defendant objects to the admissibility of this statement, saying that it relies on multiple levels of inadmissible hearsay.  *See* Def.'s Resp. to Order of the Court ("Def.'s Supp."), ECF No. 24, at 2–3.  But that objection relates mainly to the coworker declarations; it does not address Martinez's deposition testimony.  *See id.*  Martinez testified in her deposition that, on "January 3, if I'm not wrong, of 2017, our talent meeting, . . . Ms. Cintron stated in that meeting that, Finally, the Puerto Rican concerns, a lot of Puerto Rican on-air talent concerns were finally addressed."  Martinez Dep. at 88:4–8.  She later testified that she was present for this statement—it is not something she learned from others.  *See* Transcript of Omayra Martinez, ECF No. 19-2, at 138:5–139:13 (this excerpt is not included in the previous document cited as "Martinez Dep").

Cintron's statement itself is not hearsay.  It is not offered for the truth of the matter asserted, that is, that a "Puerto Rican problem" at the radio station had been solved.  Rather, it is offered to show anti-Puerto Rican animus on the part of Cintron.

The question then becomes whether *Martinez*'s testimony about Cintron's statement is inadmissible hearsay.  This statement *is* offered to prove the truth of the matter asserted:  that Cintron did, in fact, say the comment.  But while in the trial context deposition testimony might constitute a level of hearsay, it does not do so at the summary-judgment stage:  "Deposition testimony, irrespective of its contents, is ordinarily hearsay when submitted at trial or a motion hearing involving live witness testimony but not in a summary judgment motion." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 779 n.27 (9th Cir. 2002) (collecting citations); *see also* Fed. R. Civ. P. 56(c) & (e) (allowing the use of deposition testimony in a summary judgment motion). Accordingly, Martinez's deposition testimony itself, at least at this stage, is not hearsay.  The only potential hearsay is Cintron's alleged statement, but as discussed above, Martinez is not offering that statement for the truth of the matter asserted.

But if it is not hearsay, Entercom argues, the statement is irrelevant.  *See* Pl.'s Supp. at 3. That is because, it claims, "there is no evidence that Ms. Cintron was involved in the decision to reduce Plaintiff's position seven months after allegedly making the comment at issue."  *Id.*  The test for relevance, however, is not demanding:  the evidence need only tend to make some fact more or less probable than it would be without that evidence and be of consequence in determining the action. Fed. R. Evid. 401.  At this stage, the Court is not prepared to say that Cintron's anti-Puerto Rican statement does not meet either prong.

Accordingly, the Court will consider Cintron's statement at the January 2017 meeting when assessing Entercom's Motion.

**B. Biaggi's statement that Sanchez told him that Martinez sounded "too Puerto Rican"**

Entercom next objects to a declaration from Pedro Biaggi, offered by Martinez in opposing summary judgment. Pl.'s Supp. at 3. Specifically, Entercom objects to Biaggi's statement that Sanchez told him, at some point in 2015, that Martinez sounded "too Puerto Rican." *Id.* Again, Entercom claims this statement is irrelevant, given that Sanchez *hired* Martinez after he allegedly said it. *See id.* But that objection merely goes to the evidence's weight, not its admissibility. The Court will thus consider it when assessing Entercom's Motion.

**C. Statements from Sanchez that he offered Martinez a cohost job with a starting salary of $50,000**

Finally, Entercom objects to another part of Biaggi's declaration, where he asserts that Sanchez offered Martinez a salary of $50,000. Entercom raises several evidentiary objections to this statement. But the Court will not consider it for a different reason: "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge." Fed. R. Civ. P. 56(c)(4). Biaggi's declaration states that he "was not present for this interview." Decl. of Pedro Biaggi, ECF No. 19-21, at ¶ 10. Because Biaggi was not present at this meeting, and thus has no *personal* knowledge of what Sanchez said, the Court will not consider his statement.

\*     \*     \*

In light of those evidentiary conclusions, the Court can turn to Martinez's claims.

## II. MARTINEZ'S DISCRIMINATION CLAIM FAILS

As discussed, Martinez claims racial discrimination by Entercom, in violation of both § 1981 and the D.C. Human Rights Act. *See* Compl. ¶¶ 136–41, 167–73. Accordingly, both claims can be assessed under Title VII's burden-shifting framework. *Ayissi-Etoh*, 712 F.3d at 576.

In filing its Motion, Entercom assumed that Martinez would attempt to prove unlawful discrimination with indirect evidence. *See* Def.'s Mot. at 7–10. It thus offered a nondiscriminatory reason for letting Martinez go—complying with budget cuts. Entercom accordingly argues that the Court need only determine whether Martinez has produced enough evidence for a reasonable jury to find that Entercom's claimed nondiscriminatory reason was not the real reason for this action. *Brady*, 520 F.3d at 494.

But Martinez never tries to rebut this nondiscriminatory reason. Not once in her briefing does she address it. *See* Pl.'s Resp. at 21–25. Instead, she argues that she has shown unlawful discrimination through *direct* evidence—*not* indirect evidence. *See id.* She relies on two events to demonstrate direct discrimination. Neither is sufficient.

First, Martinez points to Cintron's statement, following Biaggi's departure, that "[t]he Puerto Rican issue at the station is finally addressed." Pl.'s Resp. at 25; *see also id.* at 23 ("Cintron's announcement to the team following Biaggi's departure that 'Puerto Rican Issues Have Finally Been Resolved' constitutes *direct evidence of discrimination* based on ethnicity . . . , which precludes summary judgment" (emphasis added)). But this comment runs into many problems. For one, it does not relate to the decision to terminate Martinez's employment; that decision came many months later. Even if the statement were temporally proximate to her termination, Martinez has offered no evidence whatsoever to show that Cintron had any involvement in that decision. This comment is therefore not *direct* evidence that Martinez was fired because of her heritage. *See, e.g.*, *Lemmons*, 431 F. Supp. 2d at 86 ("Direct evidence of discrimination is evidence that, if believed by the fact finder, proves the particular fact in question *without any need for inference*."). At most it is indirect evidence, but as discussed, Martinez does not pursue such a theory. *See* Pl.'s Resp. at 21–23.

17

Second, Martinez points to the alleged statement by Sanchez that he thought Martinez "sounded too Puerto Rican." Pl.'s Resp. at 25. But despite calling this "direct evidence of anti-Puerto Rican discrimination," *id.*, Martinez fails to show that to be the case. Again, the statement was not temporally proximate to Martinez's termination; the statement was made (if at all) well over a year before there was any discussion of letting Martinez go. Indeed, Sanchez decided to hire Martinez *after* this alleged comment was made.

Thus, because Martinez has failed to identify any evidence of direct discrimination, and because she has not tried to show that Entercom's claimed nondiscriminatory reason for terminating her was pretext, the Court grants summary judgment to Entercom on Count I and VI.[10]

### III. MARTINEZ'S HOSTILE-WORK-ENVIRONMENT CLAIM FAILS

As discussed above, to make out a hostile-work-environment claim under § 1981 (and thus, the D.C. Human Rights Act), Martinez must show that "she was subjected to discrimination, intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Ayissi-Etoh*, 712 F.3d at 577 (quoting *Harris*, 510 U.S. at 21) (quotations omitted). She fails to meet this burden.

It is hard to follow Martinez's brief on this point. It repeats the legal holdings of many cases—many out of circuit—but it rarely, if ever, engages with the facts of the case. *See* Pl.'s Resp. at 26–31. It appears, however, that Martinez bases her hostile-work-environment claim on four events: Sanchez's statement to Biaggi that Martinez sounded too Puerto Rican, *id.* at 3 ¶ C; Cintron's statement to Martinez that she sounded too Puerto Rican, *id.* at 3–5 ¶ D; Martinez's having to go on air with little notice during her training, *id.* at 7–8 ¶ I; and Cintron's statement that

---

[10] Throughout this section of her brief, Martinez suggests that she is also pursuing a claim under Title VII. *See* Pl.'s Resp. at 21–25. But she raised no Title VII claim in her Complaint. *See generally* Compl. The Court thus does not reach any Title VII questions.

the Puerto Rican issues at the station were resolved when Biaggi was let go, *id.* at 9–10 ¶ M.  *See id.* at 27 ("This is satisfied by the above facts.  See PAF ¶¶ C, D, I, M.").

As a general matter, courts "frown[ ] on plaintiffs who attempt to bootstrap their alleged discrete acts of retaliation into a broader hostile work environment claim." *Baloch v. Norton*, 517 F. Supp. 2d 345, 364 (D.D.C. 2007), *aff'd sub nom. Baloch v. Kempthorne*, 550 F.3d 1191 (D.C. Cir. 2008).  "A plaintiff cannot simply regurgitate retaliatory discipline claims in an effort to flesh out [her] hostile work environment claims.  But that is what [Martinez] has done here." *Brett v. Brennan*, 404 F. Supp. 3d 52, 66 (D.D.C. 2019) (quoting *Wada v. Tomlinson*, 517 F. Supp. 2d 148, 210 (D.D.C. 2007)) (quotations omitted) (alterations accepted).

Martinez uses each of these four incidents to support either her discrimination or retaliation claims.  But a "[p]laintiff cannot . . . rely on the discrete acts upon which [s]he bases [her] discrimination and retaliation claims to support a hostile work environment claim." *Hampton v. Vilsack*, 760 F. Supp. 2d 38, 57 (D.D.C. 2011).  Entercom made this very point in its motion for summary judgment.  *See* Def.'s Mot. at 10.  Yet Martinez ignored it in her opposition.

In any event, these events were neither sufficiently severe nor pervasive to support a hostile work environment claim.  Indeed, her "assertion of pervasive and constant abuse is undermined by the sporadic nature of the" instances she identifies. *Baloch*, 550 F.3d at 1201.  And some, like having to go on air during training with little notice, Martinez has not even tied to her Puerto Rican heritage.  The Court will thus grant summary judgment to Entercom on Count II and VI.

## IV. MARTINEZ'S RETALIATION CLAIM FAILS

Martinez's retaliation claim fares no better.  Entercom has offered a nonretaliatory reason for firing Martinez: budget constraints.  Def.'s Mot. at 12.  Thus, "[o]nce the employer has asserted a legitimate, non-retaliatory reason for firing an employee, the central question at the summary

judgment stage becomes whether the employee has produced sufficient evidence for a reasonable jury to find that the employer's asserted non-retaliatory reason was not the actual reason and that the employer fired the employee as retaliation." *Johnson*, 849 F.3d at 1099 (quotation omitted). Martinez has failed to meet this burden.

Nowhere in Martinez's brief does she attempt to refute Entercom's proffered nondiscriminatory reason for letting her go. *See* Pl.'s Resp. at 31–34. Instead, she merely attempts "[t]o establish a prima facie case of retaliation." *Id.* at 31. Entercom notes this failure. *See* Def.'s Reply Mem. in Supp. of Mot. for Summ. Judg. ("Def.'s Reply"), ECF No. 22, at 9 ("Plaintiff's hostile work environment [claim] fails primarily because she has failed to rebut Defendant's legitimate, nondiscriminatory reason for her termination."). And the Court agrees. The existence of a prima facie case does not matter when a defendant proffers a nondiscriminatory reason for taking the alleged retaliatory action. *See Johnson*, 849 F.3d at 1099 (citing *Brady*, 520 F.3d at 494). It is up to the plaintiff to rebut such a nondiscriminatory reason when one is offered, *see id.* at 1099–1100, and Martinez has altogether failed to do so here. The Court will thus grant summary judgment to Entercom on Count III.[11]

## V. MARTINEZ'S WAGE-ACT CLAIMS FAIL

Turning next to Martinez's Wage Act claims, she claims that Entercom violated the Act in two separate instances. First, she contends that she "was instructed to continue coming into the station following the audition period after being offered a full-time job with benefits and a salary

---

[11] Martinez's Complaint bases her retaliation claim on her firing alone. *See* Compl. ¶¶ 149–55. But in her opposition brief, she also claims that she faced retaliation by not being offered a hotel room in the snowstorm and by not being offered to participate in a "Talent Line-Up." Pl.'s Resp. at 31. Yet Martinez never counters the nondiscriminatory reason for her not receiving a hotel room—that only employees who did not live in the District received them. And she cites no evidence showing a retaliatory motive behind not being invited to the "Talent Line-Up."

of $50,000/year."  Pl.'s Opp. at 35.  She argues that "[t]his constitutes an oral employment agreement which entitles Plaintiff Martinez to the promised hourly wage of $34.72."[12]  Thus, because "[f]or nearly two months Plaintiff followed Defendant's directive to continue coming into work (approximately six hours per weekday) without pay while they 'processed paperwork,'" and because she received only $2,000 in February for her work during the audition period, Martinez claims that she "should have been paid $12,500 for five months of work."  *Id.* at 36.

It is again difficult to follow Martinez's claim.  But to the extent it presents a legal theory, it is inconsistent with the overwhelming weight of the evidence.  *See Scott*, 550 U.S. at 380.  She points to no evidence supporting how many hours she allegedly worked.  *See* Pl.'s Opp. at 34–36.  And even if she did, she has failed altogether to proffer facts suggesting that she was an "employee," as that term is used in the Act, before signing her employment contract.  An "employee" is "any person suffered or permitted to work by an employer."  D.C. Code § 32-1301(2).  But as the overwhelming evidence shows, Martinez was under no obligation to work beyond her audition period—a period for which she later received payment.  Indeed, as she herself admitted, "I returned and kept coming to the show solely to improve in my capacity; and to become more in tune with the team."  Martinez Dep. ex. 4, at 3.

Second, Martinez claims that Entercom violated the Wage Act in 2017 by failing to pay her at an hourly rate commiserate with a salary of $38,000 per year.  Pl.'s Resp. at 36–37.  Rather, she states, she was paid at a rate of $23.50 per hour.  *Id.*  But as discussed above, the uncontroverted record evidence shows that Martinez *never signed the contract* entitling her to a $38,000 salary.

---

[12] Martinez obtains this proposed hourly rate by assuming she would work thirty hours per week for forty-eight weeks.  *See* Pl.'s Resp. at 36 n.7.

Thus, the operative arrangement entitled her to payment at a rate of $23.50 per hour—the rate that, as discussed above, she admits that she was paid.

Accordingly, the Court will grant Entercom summary judgment on Claim IV.

## VI. MARTINEZ'S MISAPPROPRIATION OF LIKENESS CLAIM FAILS

Martinez's final claim is for misappropriation of her likeness.  *See* Compl. ¶¶ 161–66.  To "state a cause of action, the plaintiff must allege, and later prove, that the defendant's commercial benefit was derived from the identity of the plaintiff and the value or reputation which the public associates with that identity."  *Tripp*, 257 F. Supp. 2d at 43 (quotation omitted); *see id.* at 42 ("[I]t is clear that where the D.C. Court of Appeals has denied plaintiffs relief on a misappropriation of name or likeness theory, it has relied heavily on the lack of 'value' associated with mention or use of the plaintiff's name or likeness.").

Martinez "testified that all of the recordings she claims to have heard after she left El Zol were recordings that she produced while she was working for El Zol."  Pl.'s Resp. at 15 ¶ Y.  But as Entercom argues, there is no evidence that shows that anyone associated any value with Martinez's identity or reputation.  *See* Def.'s Mot. at 13–14.  Martinez failed altogether to respond to this argument.  *See* Pl.'s Resp. at 37.  The Court thus concludes that not only do the facts and law favor Entercom's position, *Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 509 (D.C. Cir. 2016), but also that Martinez has conceded her claim by failing to respond to Entercom's arguments, *see Wilkins v. Jackson*, 750 F. Supp. 2d 160, 162 (D.D.C. 2010).  The Court will thus grant summary judgment to Entercom on Count V.

**CONCLUSION**

For the foregoing reasons, the Court **GRANTS** Entercom's Motion for Summary Judgment, ECF No. 17. An appropriate order will follow.

DATE:  March 21, 2022

_____
CARL J. NICHOLS
United States District Judge